# EXHIBIT "C"

COPY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

KENNETH FRILANDO,

   Plaintiff,

                                No. 18-5204

  -against-

NEW YORK CITY TRANSIT AUTHORITY,
and MANHATTAN and BRONX SURFACE
OPERATING AUTHORITY
           Defendants.
------------------------------------------x

                      24 Union Square East
                      New York, New York

                      February 13, 2019
                      1:15 p.m.

   DEPOSITION of MICHAEL QUIERY, a 30(b)(6) witness for the Defendant, taken by the Plaintiff, pursuant to Notice, held at the above time and place, taken before Shechinah Jackson, a Shorthand Reporter and Notary Public of the State of New York.

            LH REPORTING SERVICE, INC.
          Computer-aided Transcription
                718-526-7100

```
 1                      M. QUIERY
 2   that you did not mention?
 3        A.   Not that I'm aware of.
 4        Q.   Okay.  Did you review any policy
 5   documents?
 6        A.   No, not that I'm aware of.
 7        Q.   Could you, again just for the record,
 8   state your full name.
 9        A.   Michael Quiery.
10        Q.   What is your current address?
11        A.   180 Livingston Street, Brooklyn, New
12   York 11201.
13        Q.   How are you employed?
14        A.   Who am I employed by?
15        Q.   Who are you employed by?
16        A.   New York City Transit.
17        Q.   What is your position?
18        A.   Senior director.
19        Q.   Is that of Testing, Selection and
20   Classification?
21        A.   Yes.
22        Q.   What were your duties an
23   responsibilities in that position?
24        A.   I'm responsible for overseeing the
25   development and administration for personal
```

```
 1                      M. QUIERY
 2   selection test for New York City Transit, the
 3   Manhattan and Bronx Surface Operating Authority
 4   and the MTA Bus Company.
 5         Q.   How long have you held that position?
 6         A.   For about four years.
 7         Q.   Do you know what the relationship is
 8   between the New York City Transit Authority and
 9   the MTA Bus Company?
10         A.   Just that one MTA -- MABSTOA is a --
11   loosely-termed as a subsidiary of New York City
12   Transit.
13         Q.   MABSTOA is separate from the MTA Bus
14   Company; is that a separate entity from the MTA
15   Bus Company?
16         A.   As far as I'm aware of.
17         Q.   Okay.  New York City Transit is your
18   director employer?
19         A.   My actual payroll is with MABSTOA,
20   Manhattan and Bronx Surface Transit Operating
21   Authority.
22         Q.   As part of your role, do you oversee
23   the testing for positions for all three of
24   these entities?
25         A.   Right, correct.
```

```
 1                         M. QUIERY
 2        Q.   Does the New York City Transit
 3   Authority make policies and procedures that
 4   MABSTOA have to follow?
 5        A.   In what context?
 6        Q.   I guess in any context that you are
 7   aware of?
 8        A.   So, in my work, MABSTOA follows,
 9   generally follows, the practices and procedures
10   that New York City Transit Authority follows
11   under civil service.
12        Q.   Are you aware of ways in which the
13   policies or practices of MABSTOA are, as it
14   affects your job, are different from the New
15   York City Transit Authority?
16        A.   In particular ways, are you asking?
17        Q.   Yes.
18        A.   I'm hard-pressed to think of anything
19   specifically that -- where the process is
20   different.  Not that I can think of offhand.
21        Q.   Have you received training from the
22   New York City Transit Authority in terms of
23   providing reasonable accommodations for job
24   candidates or prospective employees?
25        A.   All employees receive annual training
```

```
 1                      M. QUIERY
 2      A.   No.
 3      Q.   Other than the online module that you
 4 described, are employees provided with any type
 5 of written materials on providing reasonable
 6 accommodations for individuals with
 7 disabilities?
 8      A.   The only written material would be
 9 anything that we are obligated to follow that's
10 mandated the Department of Citywide
11 Administrative Services.
12      Q.   Where would you find those mandates?
13      A.   If there's anything in writing, it
14 would be in their personal rules and
15 regulations for their exam procedures.
16      Q.   Are the personal rules and regulations
17 provided to your staff?
18      A.   They're available to my staff, yes.
19      Q.   Are your staff trained on their rules
20 and regulations?
21      A.   They are trained at some point on
22 their rules and regs.
23      Q.   Do you know when?
24      A.   No.
25      Q.   Do you know if the rules and
```

```
 1                      M. QUIERY
 2    regulations contain specific provisions for
 3    providing accommodations for disabled
 4    individuals?
 5         A.   I don't.
 6         Q.   In terms of exam procedures, what are
 7    you referring to?
 8         A.   I'm sorry?
 9         Q.   You said that DCAS also provides them
10    in the form of exam procedures; is that
11    correct?
12         A.   So, it would be -- yeah, they would
13    have their examination procedures, just in
14    terms of the administration of an exam, certain
15    regulations that must be followed in terms of
16    an exam administration.
17         Q.   Where are these regulations found?
18         A.   DCAS has them online, the regulations.
19         Q.   Does DCAS provide training to your
20    staff on the exam procedures?
21         A.   No.
22         Q.   Do you provide training to your staff
23    on the DCAS exam procedures?
24         A.   My managers have a copy of the
25    procedures and they use them when training
```

```
1                        M. QUIERY
2    before they publish to the public.  I'm trying
3    think if --
4        Q.  Do they have any oversight rule in the
5    actual administration of the exam?  Do you have
6    to submit any type of paperwork for them to
7    review or anything of that nature?
8            MS. DOWNS:  Objection.
9        A.  No.
10       Q.  So, they're -- beyond them reviewing
11   the Notice of Exam paperwork, do they have any
12   other rule in insuring compliance?
13       A.  DCAS has complete oversight over
14   everything that we do in examinations.
15       Q.  Do DCAS employees ever come onto your
16   site to make sure that your employees are
17   complying with their regulations?
18       A.  I can't remember if they did that.
19       Q.  In what ways do you, in terms of
20   providing accommodations for test takers, what
21   role does DCAS play in that process?
22       A.  Again, DCAS provides the oversight and
23   the guidance through their written policies and
24   practices.
25       Q.  Does DCAS need to review requests for
```

Case 1:18-cv-05204-JSR   Document 50-3   Filed 07/29/19   Page 9 of 15

23

M. QUIERY

Q. Have you ever trained staff members on how to order an ASL interpreter?

A. No.

Q. Do your staff members receive any formal training from DCAS directly?

A. Not formal training, no.

Q. So, would you refer to it as informal training?

    MS. DOWNS: Objection.

A. I would refer to it as "guidance as needed."

Q. How are they trained to seek guidance from DCAS?

A. So, my staff performs functions under DCAS rules and regulations and policies. So, they're aware of how to perform their work. They will ask for guidance when they come across something that they're unfamiliar with it. And in those instances, they'll seek for guidance.

Q. Do you train them when they should seek guidance from DCAS?

A. Train them?

Q. Yes. Do you tell them -- do you,

```
 1                    M. QUIERY
 2      Q.  What is the -- turning back to the
 3   track worker exam.  What is the procedure if
 4   someone needs to request an accommodation?
 5      A.  The exact procedure is something my
 6   staff would know better about.  I have a
 7   familiarity with the procedure that the
 8   individual would make a request at the time of
 9   application.  Then at some point -- I can't be
10   certain on timing of it.  But at some point
11   later on, after the initial request, at the
12   time of application they need to substantiate
13   their request with written substantiations from
14   a doctor or whomever.
15      Q.  When you say, "substantiate the
16   request," what do you mean by that?
17      A.  So, if they're asking for an
18   accommodation, they need to get some, have that
19   substantiated by someone that's an expert in
20   that field to say that they need that
21   accommodation.
22      Q.  Okay.  If a deaf or hard of hearing
23   person submitted an application with an
24   audiology report that demonstrated that that
25   individual was profoundly deaf, would that be
```

M. QUIERY

sufficient proof that that individual required an interpreter?

A. No. We would want to see the physician actually state that, that he needs an interpreter. We ask that they state the actual request for accommodation, not just the disability.

Q. Is that -- was that ever given -- where did that procedure develop from?

A. That comes from DCAS.

Q. Is that in any sort of written form from DCAS?

A. I can't be certain. I'm certain -- I'm pretty sure that it's written somewhere. But I can't be certain as to the document it's written. I believe it's on the instructions for a request for accommodation, on the applicant's instructions.

Q. Do you know the rational for requiring someone with an obvious disability, such as deafness, to also obtain a doctor's note in addition to documentation that substantiates that disability?

MS. DOWNS: Objection.

Case 1:18-cv-05204-JSR   Document 50-3   Filed 07/29/19   Page 12 of 15

42

```
 1                    M. QUIERY
 2    position?
 3         A.   Yes, it seems to.
 4         Q.   What are the qualifications for that
 5    position?
 6         A.   For train operator, the qualifications
 7    are a four-year high school diploma or
 8    educational equivalent.  The educational
 9    equivalent has to be recognized by the State
10    Department of Education or recognized as a
11    credit-dating organization.
12              In addition to that, they must possess
13    a motor vehicle driver's license valid in New
14    York State and have one year full-time
15    satisfactory work experience continuous with
16    one employer.
17         Q.   Is an applicant that applies to take
18    the train operator exam required to qualify for
19    these qualifications at the time that they
20    apply to take the test?
21         A.   Give me a second to read the notice.
22    No.  It says for the test they dont have to.
23              Let me say this, the qualifications
24    are not verified prior to them not sitting for
25    the test.
```

```
 1                    M. QUIERY
 2       Q.  When are their qualifications
 3   verified?
 4       A.  So, we look at their qualifications
 5   that they submitted with the application after
 6   the test is held.  And we only look at the
 7   individuals who passed the written test to
 8   verify whether they meet the minimum
 9   qualification requirements.
10       Q.  Are you familiar with the oral
11   proficiency assessment?
12       A.  Yes.
13       Q.  Who conducts the oral proficiency
14   assessment?
15       A.  My staff.
16       Q.  Which part of your staff?
17       A.  The exam development group.
18       Q.  How would your organization provide
19   accommodations to a deaf or hard of hearing
20   person for the oral proficiency assessment?
21       A.  I can't answer that because we haven't
22   -- as far as -- I haven't been asked that.
23       Q.  If someone brought you -- if someone
24   who is deaf or hard of hearing wanted to take
25   the oral proficiency assessment, what would
```

```
 1                    M. QUIERY
 2    practice.
 3         Q.   What is the transit practice?
 4         A.   To follow the DCAS regulations and
 5    directives.
 6         Q.   How would that differ for the track
 7    worker position?
 8         A.   It wouldn't different.
 9         Q.   Okay.  Is the procedure for requesting
10    accommodations for either those three positions
11    different in any way?
12         A.   Not that I'm aware of, no.
13         Q.   Is the procedure for responding to a
14    request for accommodations for either of those
15    positions different in either way?
16         A.   Again, not that I'm aware of.
17         Q.   Did there come a time where you
18    learned of pending applications from Kenneth
19    Frilando?
20         A.   Yes.
21         Q.   When did you learn of those
22    applications?
23         A.   I can't be certain on the time frame.
24         Q.   How did you learn?
25         A.   I believe I heard from Michael Nigro.
```

```
 1                    M. QUIERY
 2              C E R T I F I C A T E
 3   STATE OF NEW YORK)
 4                   :ss
 5   COUNTY OF NASSAU)
 6
 7        I, SHECHINAH JACKSON, a Notary Public
 8   within and for the State of New York, do hereby
 9   certify:
10        That the witness whose examination is
11   hereinbefore set forth was duly sworn and that
12   such an examination is a true record of the
13   testimony given by such a witness.
14        I further certify that I am not related to
15   any of these parties to this action by blood or
16   marriage, and that I am not in any way
17   interested in the outcome of this matter.
18        IN WITNESS WHEREOF, I have hereunto set my
19   hand this 13TH day of February, 2019.
20
21
22
23                              _____
                                     Shechinah Jackson
24
25
```