**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KENNETH FRILANDO,

|                          | Plaintiff, |
| --- | --- |

-against-

NEW YORK CITY TRANSIT AUTHORITY
and MANHATTAN AND BRONX
SURFACE OPERATING AUTHORITY,

Defendants.

18 Civ. 5204 (JSR)

## PLAINTIFF'S REDACTED POST-TRIAL BRIEF

Dated: November 4, 2020

Andrew Rozynski, Esq.
David John Hommel, Esq.
**EISENBERG & BAUM, LLP**
24 Union Square East, Fourth Floor
New York, NY 10003
Main: (212) 353-8700
Fax: (212) 353-1708
arozynski@eandblaw.com
dhommel@eandblaw.com
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

**INTRODUCTION** ............................................................................................................. 1

**BACKGROUND** ............................................................................................................... 1

I.    Basic Facts ................................................................................................................. 2

A.    Mr. Frilando Is Deaf, and His Primary Language Is American Sign
Language ....................................................................................................... 2

B.    Mr. Frilando Applies for Three Jobs with Defendants and Requests
Accommodations, Including an ASL Interpreter to Interpret Pre-
Employment Tests, Which an Applicant Must Take and Pass Before
Defendants Consider Any Qualifications .................................................... 2

C.    Based on an Across-the-Board Policy, Defendants Will Not Allow
Interpretation of the Pre-Employment Tests in ASL After Emailing with
Mr. Frilando for Sixteen Months ............................................................... 4

D.    As a Result, Mr. Frilando Has Suffered Frustration, Humiliation, and Other
Emotional Anguish ...................................................................................... 5

II.   Procedural History ................................................................................................... 6

A.    Judge Schofield's Summary-Judgment Decision, Which Correctly
Delineated Accommodations for the Pre-Employment Tests and On-the-Job
Accommodations ......................................................................................... 7

B.    Remaining Issues for Trial ......................................................................... 8

**LIABILITY ANALYSIS** ................................................................................................ 8

I.    Legal Backdrop ........................................................................................................ 8

A.    The Court Should Consider Interpretive Guidance from the EEOC and the
New York City Commission on Human Rights ......................................... 8

B.    Under the City Law, Mr. Frilando Is Entitled to Reasonable
Accommodations, and Every Accommodation Is Reasonable Unless
Defendants Prove Undue Hardship or Satisfy a Single Affirmative
Defense ......................................................................................................... 9

II.    Mr. Frilando Is Entitled to Reasonable Accommodations to Take the Pre-Employment Tests ................................................................................10

    A.    Consistent with Judge Schofield's Decision, an Employer's Obligation to Provide Reasonable Accommodations Equally Applies to Employees and Applicants Who Can Take a Pre-Employment Test ...............................................11

    B.    As a Factual Matter, Virtually Everyone Can Take Defendants' Pre-Employment Tests, and Mr. Frilando Was Scheduled to Do So ..........................12

    C.    For the City Law Claim, the Court Should Preclude Any Evidence of Undue Hardship, as Contemplated by 28 C.F.R. § 35.164, Beyond the Contemporaneous Emails ......................................................................13

    D.    Defendants Failed to Show Undue Hardship..........................................14

    E.    For Pre-Employment Accommodations, Defendants' Failure to Engage in the Interactive Process in Good Faith Is an Independent Legal Violation ...........16

III.    Defendants Are Still Liable Even if the Court Were to Consider Whether Mr. Frilando Can Perform the Essential Functions of the Three Jobs, With or Without Reasonable Accommodations..............................................................17

    A.    Under the City Law, Defendants Bear the Burden of Proof and Have Failed to Satisfy Their Affirmative Defense .....................................................17

    B.    For on-the-Job Accommodations, Defendants Failed to Engage in the Interactive Process ..............................................................................18

    C.    Under State and Federal Law, Mr. Frilando Has Satisfied His Burden Because Among Other Things, He Can Perform the Track Worker Position ............................................................................................19

DAMAGES ANALYSIS.............................................................................21

I.    Money Damages .............................................................................21

    A.    The City Law Provides for Damages Solely for Statutory Violations..................22

    B.    Under State and City Law, Mr. Frilando Is Entitled to Damages for Emotional Distress Without Proof of Intentional Discrimination Because Defendants' Conduct Caused Him to Suffer Frustration, Humiliation, and Other Emotional Anguish for Sixteen Months Before the Lawsuit Was Even Filed ......................................................................................22

C.    Under the Rehabilitation Act, Mr. Frilando Is Entitled to Damages for Emotional Distress Because Defendants Discriminated Against Him Through Deliberate Design and Apathetic Attitudes ............................................24

II.    Injunctive and Declaratory Relief ........................................................................25

III.   Attorney's Fees ....................................................................................................25

**CONCLUSION** ........................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Choate*,
  469 U.S. 287 (1985) ............................................................................................................24

*Am. Council of the Blind of N.Y., Inc. v. City of N.Y.*,
  No. 18 Civ. 5792 (PAE), 2020 U.S. Dist. LEXIS 194231 (S.D.N.Y. Oct. 20, 2020) .............13

*Bartlett v. N.Y. State Bd. of Law Exam'rs*,
  970 F. Supp. 1094 (S.D.N.Y. 1997), *aff'd in part and vacated in part on other grounds*,
  156 F.3d 321 (2d Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999).....................24

*Brooklyn Ctr. for Psychotherapy, Inc. v. Phila. Indem. Ins. Co.*,
  955 F.3d 305 (2d Cir. 2020)................................................................................................22

*Broome v. Biondi*,
  17 F. Supp. 2d 211 (S.D.N.Y. 1997)....................................................................................23

*Delano-Pyle v. Victoria Cnty.*,
  302 F.2d 567 (5th Cir. 2002) ..............................................................................................23

*Duarte v. St. Barnabas Hosp.*,
  341 F. Supp. 3d 306 (S.D.N.Y. 2018) .............................................................................22, 23

*Gerena v. Fogari*,
  No. HUD-L-5805-05, 2008 Jury Verdicts LEXIS 33319 (N.J. Super. Ct. Oct. 9, 2008).........23

*J.E.B. v. Alabama*,
  511 U.S. 127 (1994)............................................................................................................24

*Kho v. N.Y. & Presbyterian Hosp.*,
  344 F. Supp. 3d 705 (S.D.N.Y. 2018) ...................................................................................9

*Lamonica v. North Shore Univ. Hosp.*,
  No. 94 Civ 5993, 1997 Jury Verdicts LEXIS 69840 (E.D.N.Y. Aug. 20, 1997) ....................23

*Lore v. City of Syracuse*,
  670 F.3d 127 (2d Cir. 2012)............................................................................................22, 23

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
  715 F.3d 102 (2d Cir. 2013)................................................................................................13

*Noll v. Int'l Bus. Machines Corp.*,
  787 F.3d 89 (2d Cir. 2015)..................................................................................................10

*Pierce v. District of Columbia*,
   128 F. Supp. 3d 250 (D.D.C. 2015) ........................................................................24

*Powers v. Ohio*,
   499 U.S. 400 (1991) ..............................................................................................24

*Puerner v. Hudson Spine & Pain Med., P.C.*,
   No. 17-cv-03590 (ALC), 2018 U.S. Dist. LEXIS 147276 (S.D.N.Y. Aug. 28, 2018) .............24

*Riverbay Corp. v. N.Y.C. Comm'n on Human Rights*,
   2011 N.Y. Misc. LEXIS 7105 (N.Y. Sup. Ct. Bronx Cnty. Sept. 9, 2011) ...........................8, 9

*Searls v. Johns Hopkins Hosp.*,
   158 F. Supp. 3d 427 (D. Md. 2016) ........................................................................18

*Seittelman v. Sabol*,
   91 N.Y.2d 618 (N.Y. 1998) .....................................................................................9

*Sheely v. MRI Radiology Network, P.A.*,
   505 F.3d 1173 (11th Cir. 2007) ..............................................................................24

*Tolbert v. Queens Coll.*,
   242 F.3d 58 (2d Cir. 2001) .....................................................................................19

*Vangas v. Montefiore Med. Ctr.*,
   6 F. Supp. 3d 400 (S.D.N.Y. 2014) ....................................................................10, 16

*Vega-Ruiz v. Montefiore Med. Ctr.*,
   No. 17-CV-1804-LTS-SDA, 2019 U.S. Dist. LEXIS 117406 (S.D.N.Y. July 15, 2019) ........22

*Williams v. MTA Bus Co.*,
   No. 17cv7687 (DF), 2020 U.S. Dist. LEXIS 69558 (S.D.N.Y. Apr. 20, 2020),
   *appeal docketed*, No. 20-2985 (2d Cir. Sept. 3, 2020) ...............................................7

## STATUTES

29 U.S.C. § 794 ......................................................................................................9, 25

29 U.S.C. § 794a ...........................................................................................................21

42 U.S.C. § 12112 ...........................................................................................................11

42 U.S.C. § 12117 ...................................................................................................21, 25

42 U.S.C. § 12205 ...........................................................................................................25

N.Y. Exec. Law § 297 ..................................................................................................21, 25

N.Y.C. Admin. Code § 8-102 .......................................................................................10, 14

N.Y.C. Admin. Code § 8-107 ...................................................................................9, 10, 17

N.Y.C. Admin. Code § 8-130 .......................................................................................10, 13

N.Y.C. Admin. Code § 8-502 ...........................................................................19, 21, 22, 25

## REGULATIONS AND OTHER AUTHORITIES

28 C.F.R. § 35.130 ........................................................................................................15, 16

28 C.F.R. § 35.164 ..............................................................................................................13

29 C.F.R. § 1630.2 ..............................................................................................................19

29 C.F.R. Pt. 1630 App. ...................................................................................................8, 11

EEOC, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the
  Americans with Disabilities Act (Oct. 17, 2002),
  https://www.eeoc.gov/policy/docs/accommodation.html ............................................8, 11, 12

Craig Gurian, *A Return to Eyes on the Prize: Litigating under the Restored New York City
  Human Rights Law*, 33 Fordham Urb. L.J. 255 (2006) ............................................................10

N.Y.C. Comm'n on Human Rights, Legal Enforcement Guidance on Discrimination on the Basis
  of Disability (June 2018), https://on.nyc.gov/2zu4LKj .................................................. *passim*

## INTRODUCTION

"Our city is at its best when it draws on the abilities of all its residents." N.Y.C. Comm'n on Human Rights, Legal Enforcement Guidance on Discrimination on the Basis of Disability (June 2018) at 6, https://on.nyc.gov/2zu4LKj. "Fostering environments of inclusivity and accessibility allow people with disabilities to be full participants in New York City life," so they can "enter and remain in the workforce" and "meet their most basic and critical needs." *Id.*

The core dispute is whether Plaintiff Kenneth Frilando received reasonable accommodations to take pre-employment tests from Defendants New York City Transit Authority (the "Transit Authority") and Manhattan and Bronx Surface Operating Authority ("MaBSTOA" and together with the Transit Authority, "Defendants"). Mr. Frilando is deaf and primarily communicates through American Sign Language. When he applied to work for Defendants, he was not looking for a handout or a shortcut. All he wanted was a fair chance—to get a job, pay the bills, and save for retirement. Mr. Frilando asked for a sign-language interpreter to take the pre-employment tests, so he could fully understand the written questions and multiple-choice answers and be on equal footing with the other test-takers. Through a grab bag of justifications, Defendants refused. Mr. Frilando's desire was not only aspirational but rooted in controlling law, and Defendants violated their obligations to him.

## BACKGROUND

Plaintiff begins with a general overview, amplifying the detail in the analysis to come. The following facts are based on the evidence present at trial[1] and the stipulated facts from the Joint Proposed Pretrial Order ("JPPO"), which is available at ECF No. 90.

---

[1] When referring to the Bates numbering (e.g., DEFENDANTS 000000), Plaintiff will omit unnecessary zeroes and shorten the text to "DEF."

I.      **Basic Facts**

    A.      **Mr. Frilando Is Deaf, and His Primary Language Is American Sign Language**

Kenneth Frilando is profoundly deaf, and his deafness is a disability within the meaning of the laws at issue. JPPO ¶¶ 1-2. His primary language is American Sign Language or ASL, and his second language is English. JPPO ¶ 6. According to Dr. Judy Shepard-Kegl—an expert offered in "linguistics, interpretation, and American Sign Language"—Mr. Frilando "reads below a fourth grade level," but as evidenced by all the emails in evidence, "his writing and reading back and forth is adequate for passing notes and communicating with people." Trial Tr. 324:4-13 & 325:12-22 (Shepard-Kegl Direct). When using the computer, Mr. Frilando relies on "the spelling and grammar connections or dropdown menus" and "an ASL dictionary." Trial Tr. 416:16-19 & 424:21-24 & 427:20-428:4 (Frilando Cross). In Dr. Shepard-Kegl's opinion, Mr. Frilando's deafness affected his ability to acquire English, and his English level "is not up to par with the kind of complex English that's involved in multiple choice tests." Trial Tr. 325:22-24 & 330:6-332:22 (Shepard-Kegl Direct).

    B.      **Mr. Frilando Applies for Three Jobs with Defendants and Requests Accommodations, Including an ASL Interpreter to Interpret Pre-Employment Tests, Which an Applicant Must Take and Pass Before Defendants Consider Any Qualifications**

Beginning in April 2017, Mr. Frilando applied for three positions: Train Operator and Track Worker with the Transit Authority and Bus Operator with MaBSTOA. JPPO ¶ 7; Pl. Ex. 1 at DEF38-39 (April 2017 email). For each of the three positions, Mr. Frilando was required to take and pass a multiple-choice test. JPPO ¶ 8. Defendants processed each of his applications and sent admission letters confirming a date, time, and location for each test. Pl. Ex. 19. Defendants did not verify Mr. Frilando's qualifications for any of the three positions because that occurs only if an applicant were to take and pass a test. JPPO ¶ 9. The only requirement for the test is to submit an

application and pay a fee. *See, e.g.*, Pl. Ex. 20 at DEF12-13.

For all three positions, Mr. Frilando requested accommodations. Four key individuals were involved with these requests: (1) Jennifer Garcia, an associate staff analyst for the Transit Authority, Trial Tr. 32:19-23 (Garcia Direct); (2) Michael Nigro, an administrative staff analyst who learned of Mr. Frilando's requests in March 2018, Trial Tr. 95:16-19 & 96:1-8 (Nigro Direct); (3) Michael Quiery, a senior director of personnel testing selection and classification with the Transit Authority, Trial Tr. 174:5-11 (Quiery Direct); and (4) Robert Alexander, the Acting Assistant Commissioner for the Bureau of Examinations with the Department of Citywide Administrative Services ("DCAS"), Trial Tr. 274:21-24 (Alexander Direct).

Mr. Frilando initially asked Defendants for a "professional ASL interpreter for instructions and the test questions purposes" because his "first language is American Sign Language." Pl. Ex. 1 at DEF38-39 (Train Operator); Pl. Ex. 5 at DEF28 (Bus Operator); Pl. Ex. 6 at DEF83 (Track Worker). Mr. Frilando later clarified that he also wanted extra time and an ASL interpreter for both the written questions and answer choices. Pl. Ex. 8 at DEF315-316 (Mr. Frilando's email "requesting additional time"); Pl. Ex. 11 at PLA2 (Mr. Frilando's email asking "why the NYCT will not provide . . . an accommodation . . . to Interpret the questions and answers in ASL").

Along with his requests, Mr. Frilando submitted a doctor's note and an audiological report. JPPO ¶ 12; Pl. Exs. 23-24. In a pair of emails from March 2018, Defendants required no further documentation from Mr. Frilando to verify his disability and need for an ASL interpreter: "We have now received your emailed request for ASL Interpretation Services **and** extended time on the multiple-choice tests for [all three] exams . . . ." Pl. Ex. 9 at DEF47-48; Pl. Ex. 8 at DEF326 ("We understand that you are requesting an American Sign Language (ASL) Interpreter . . . ."). Ms. Garcia agreed that she and her team "were willing to work with [Mr.] Frilando" even though

he did not provide further documentation. Trial Tr. 85:19-25 (Garcia Cross).

### C. Based on an Across-the-Board Policy, Defendants Will Not Allow Interpretation of the Pre-Employment Tests in ASL After Emailing with Mr. Frilando for Sixteen Months

Defendants first denied Mr. Frilando's request as early as May 23, 2017: "We will be able to provide the ASL interpreter for the Test instructions, but not for the exam questions, as well as extra time. You need to be able to read in English if you want to take the exam and read the questions." Pl. Ex. 1 at DEF37. But then sixteen months passed before a final determination. Pl. Ex. 1 at DEF38-39 (April and May 2017); Pl. Ex. 11 at PLA1-2 (August 2018). On August 17 and 20, 2018, Michael Nigro approved two accommodations: (1) "200% of the regular time for the tests," Pl. Ex. 11 at PLA4; and (2) an ASL interpreter "to translate [the] staff member's oral instructions" and "any communications between [Mr. Frilando] and [the] staff member," *id.* at PLA3. Mr. Frilando expressed his confusion in response: "Please let me know why the NYCT will not provide me an accommodation for my Deafness to Interpret the questions and answers in ASL. . . . I don't understand why this is being denied. Please explain." Pl. Ex. 11 at PLA2.

On August 31, 2018, Mr. Nigro provided Defendants' rationale, which was based on an across-the-board policy:

> We do not provide translation or interpretation services of test examination questions for any candidate whose primary language is not English. This is for several reasons including that the positions require that the candidate understand and be understood in English. Furthermore, allowing ASL interpretation of the written exam questions would fundamentally alter the exam, and make uniform administration of the exam impossible.

Pl. Ex. 11 at PLA1. Defendants even memorialized this position in a contract with an ASL interpreting agency (All Hands in Motion LLC), explaining that all interpreters cannot interpret "the actual test questions and test question answer choices." Pl. Ex. 12 at DEF 200.

Thus, Defendants "drew the line at having the questions" interpreted, and a key issue, then, was "why that line was drawn and who drew it." Trial Tr. 122:2-11. For issues on reasonable accommodations, the Transit Authority seeks guidance from DCAS. *See* JPPO ¶ 16; Trial Tr. 97:12-23 (Nigro Direct). DCAS maintains an across-the-board policy under its General Examination Regulations: "Candidates must be able to understand and be understood in English." Pl. Ex. 15 at DEF253 (Regulation E.9.1). It is no surprise, then, that this language appears in every Notice of Examination that the Transit Authority oversees. Trial Tr. 175:14-17 (Quiery Direct). According to Mr. Quiery, an applicant "must understand [English] at the minimal level required for the position," but that level is not defined. *See* Trial Tr. 176:17-25 (Quiery Direct).

Based on Memoranda of Understanding ("MOU"), the Transit Authority is required to administer tests in accordance with instructions from DCAS. JPPO ¶¶ 17, 19-20; *see also* Pl. Ex. 13 (2011 MOU) & Pl. Ex. 14 (2018 MOU). But notably, MaBSTOA, which maintains the Bus Operator job, is not bound by DCAS' instructions. Trial Tr. 269:24-270:11 (Quiery Redirect). At any rate, even for the Transit Authority, each MOU may be terminated by either party, and of course, each party must "comply with all applicable city, state and federal laws." Pl. Ex. 13 at DEF234 (2. Termination of MOU) & DEF236 (6. Compliance with Laws); Pl. Ex. 14 at DEF262 & DEF268 (same for 2018 MOU). The 2011 MOU was executed on May 2, 2011. Pl. Ex. 13 at DEF238. The 2018 MOU was executed on April 30, 2018 and May 2, 2018—that is, during the email exchanges with Mr. Frilando. Pl. Ex. 14 at 269. The record contains no evidence of an intervening MOU between the 2011 and 2018 editions. Trial Tr. 295:10-14 (Alexander Direct).

### D.    As a Result, Mr. Frilando Has Suffered Frustration, Humiliation, and Other Emotional Anguish

Ultimately, because of Defendants' refusal to provide an ASL interpreter for the questions and answers, Mr. Frilando never took any of the three tests. *See* JPPO ¶ 23. He felt "frustrated,"

"depressed," "aggravated," and "pissed off." Trial. Tr. 413:18-19 (Frilando Direct); Trial Tr. 502:8-15 & 513:10-12 (Frilando Cross). During Ms. Garcia's five-year tenure, she had never emailed with an applicant about accommodation requests as much as she did with Mr. Frilando. Trial Tr. 34:6-9 (Garcia Direct); Trial Tr. 512:15-23 (Frilando Cross) ("[I]t was so much back and forth conversation that we were having and I was frustrated at the time."). In fact, the Parties went back and forth for over sixteen months, and there were often gaps between Defendants' responses. Pl. Ex. 1 at DEF38-39; Pl. Ex. 11 at PLA1-2; Trial Tr. 506:15-20 (Frilando Cross). The entire ordeal was taxing for Mr. Frilando: "I am at such more of a disadvantage because I didn't grow up listening to English and learning it that way . . . . I wanted to . . . have the interpreter for the questions and the answers and they were saying it is only for the instructions and that whole thing would have made me emotional, I was getting emotional." Trial Tr. 513:16-23 (Frilando Cross).

Mr. Frilando is 52 years old and has been unemployed since 2012. Trial Tr. 404:6-7 & 412:14-15 (Frilando Direct); Defs. Ex. 38 at PLA35 (Mr. Frilando's resume). Without a job, he relies on his mother's social security, which is "really upsetting" to him. Trial Tr. 412:16-413:5 (Frilando Direct). Over the years, Mr. Frilando has submitted "over a hundred different applications," but apparently, Defendants were one of the few employers to require pre-employment tests without interpreters for the written questions and answers. Trial Tr. 411:22-412:13 (Frilando Direct). Thus, Defendants are unique stressors in Mr. Frilando's life.

## II.   Procedural History

In the summer of 2018, Plaintiff sued Defendants for disability discrimination under Title I of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, the New York State Human Rights Law (the "State Law"), and the New York City Human Rights Law (the "City Law"). Second Am. Compl. ¶ 2, ECF No. 19.

A. **Judge Schofield's Summary-Judgment Decision, Which Correctly Delineated Accommodations for Pre-Employment Tests and On-the-Job Accommodations**

On April 22, 2020, the Honorable Lorna G. Schofield, to whom this case was assigned prior to trial, issued a decision on the Parties' motions for summary judgment.[2] Mem. & Order, ECF No. 66. Judge Schofield left three main issues for trial: (1) "whether the accommodations Defendants offered were reasonable," (2) "whether Defendants['] implementation of Plaintiff's suggested accommodations would cause Defendants undue hardship," and (3) "whether Defendants failed to engage in a good-faith interactive process." *Id.* at 15 & 21 n.3.

Pertinently, Judge Schofield agreed with Plaintiff that he need not show "whether [he] could perform the essential functions of the job at issue." *Id.* at 15-17. Judge Schofield observed that "[b]ased on the language of the ADA and the relevant case law," Plaintiff "is required to show only that he could perform the essential functions of the exams for his claim of failure to accommodate his taking the exam." *Id.* at 15. That is because "the Second Circuit focuses on whether an individual could perform the essential functions of the position for which he *seeks accommodations*," and "[h]ere, Plaintiff sought accommodation to take Defendants' exams, not to perform the duties of Train Operator, Bus Operator or Track Worker." *Id.* at 16. "If Plaintiff is able to pass any one of the exams, he must later meet other requirements for each position," but to ask him "to show that he could perform the essential functions of the three positions -- for the purpose of adjudicating the failure to accommodate claim -- would be contrary to case law and the ADA's protections for individuals in the job application process." *Id.* at 16-17.

---

[2] In a remarkable coincidence, the Honorable Debra Freeman considered this exact issue two days before Judge Schofield and reached the opposite conclusion. *Williams v. MTA Bus Co.*, No. 17cv7687 (DF), 2020 U.S. Dist. LEXIS 69558, at *20 (S.D.N.Y. Apr. 20, 2020), *appeal docketed*, No. 20-2985 (2d Cir. Sept. 3, 2020). As described below, the pertinent authority supports Judge Schofield's decision.

### B.      Remaining Issues for Trial

The Court held a bench trial beginning on October 26, 2020. The trial lasted four days, and the Court received into evidence 24 exhibits from Plaintiff, 39 exhibits from Defendants, and additional exhibits through judicial notice or for impeachment purposes. Trial Tr. 31:6-11, 298:5-299:23, 567:2-569:21. Plaintiff also introduced Fed. R. Civ. P. 30(b)(6) testimony from Defendants' designee, Michael Quiery. *See, e.g.*, Trial Tr. 162:6-163:20 & 184:9-186:24. Finally, Court Exhibit No. 1 was a sealed copy of the Track Worker test, which ostensibly "was the most relevant" of the three jobs at issue. *See* Trial Tr. 241:19-22 & 461:3-11.

### LIABILITY ANALYSIS

### I.      Legal Backdrop

### A.      The Court Should Consider Interpretive Guidance from the EEOC and the New York City Commission on Human Rights

Throughout the brief, Plaintiff refers to interpretive guidance from the Equal Employment Opportunity Commission ("EEOC"), which is "responsible for enforcement" of Title I of the ADA. 29 C.F.R. Pt. 1630 App. "This Enforcement Guidance clarifies the rights and responsibilities of employers and individuals with disabilities regarding reasonable accommodation and undue hardship," and the Court should consider it. *See* EEOC, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (Oct. 17, 2002), https://www.eeoc.gov/policy/docs/accommodation.html ("EEOC Guidance").

Similarly, the New York City Commission on Human Rights—"the City agency charged with enforcing the [City Law]"—issued Legal Enforcement Guidance, which "specifically reflects the Commission's interpretation." N.Y.C. Comm'n on Human Rights, Legal Enforcement Guidance on Discrimination on the Basis of Disability (June 2018), https://on.nyc.gov/2zu4LKj ("Commission Guidance") at 14 n.2. This Legal Enforcement Guidance is entitled to "great

deference," and the Court should also consider it. *See Riverbay Corp. v. N.Y.C. Comm'n on Human Rights*, 2011 N.Y. Misc. LEXIS 7105, at *16 (N.Y. Sup. Ct. Bronx Cnty. Sept. 9, 2011); *Seittelman v. Sabol*, 91 N.Y.2d 618, 625 (N.Y. 1998) ("It is settled law that an agency's interpretation of the statutes it administers must be upheld absent demonstrated irrationality or unreasonableness.").

### B.   Under the City Law, Mr. Frilando Is Entitled to Reasonable Accommodations, and Every Accommodation Is Reasonable Unless Defendants Prove Undue Hardship or Satisfy a Single Affirmative Defense

Generally, for failure-to-accommodate claims, a plaintiff must establish four elements, including (i) "a disability," (ii) a defendant-entity's "notice of the disability," and (iii) a refusal "to make [reasonable] accommodations." *Kho v. N.Y. & Presbyterian Hosp.*, 344 F. Supp. 3d 705, 721 (S.D.N.Y. 2018).[3] The final factor is unique here. In lieu of analyzing the essential functions of the job, the relevant inquiry is whether Mr. Frilando was entitled to reasonable accommodations to take a pre-employment test. Unlike a typical employment case, Defendants do not review any qualifications before an applicant takes the pre-employment test.

Mr. Frilando is entitled to full relief on all claims, but to expedite the liability and damages analyses, he will frequently focus on the City Law and the Track Worker position. Under the City Law, a plaintiff must show (1) that he has "a disability; (2) that the covered entity knew or should have known about the disability; (3) that an accommodation would enable the [plaintiff] to perform the essential requisites of the job *or* enjoy the rights in question; and (4) that the covered entity failed to provide an accommodation." Commission Guidance at 52 (emphasis added). The third element is the only one in dispute.

Under the City Law, Defendants are required "to make reasonable accommodation[s] to

---

[3] Claims under the Rehabilitation Act also require proof of federal financial assistance, 29 U.S.C. § 794(a), and this fact is undisputed. JPPO ¶ 4.

the needs of persons with disabilities." N.Y.C. Admin. Code § 8-107(15)(a). The City Law's "accommodation language itself is framed extremely broadly. The requirement is to make reasonable accommodation to the 'needs' of persons with disabilities (not to 'disabilities' directly)." Craig Gurian, *A Return to Eyes on the Prize: Litigating under the Restored New York City Human Rights Law*, 33 Fordham Urb. L.J. 255, 306 (2006). As the Second Circuit observed, "[ASL] interpreters are a common form of reasonable accommodation." *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 96 (2d Cir. 2015).

The City Law has two relevant exceptions, and the covered entity bears the burden for both: (1) undue hardship and (2) inability to enjoy the right or rights in question with a reasonable accommodation. N.Y.C. Admin. Code §§ 8-102 ("The covered entity has the burden of proving undue hardship.") & 8-107(15)(b) (permitting "an affirmative defense that the person aggrieved by the alleged discriminatory practice could not, with reasonable accommodation, . . . enjoy the right or rights in question"). No other exception applies. N.Y.C. Admin. Code § 8-130(b) ("Exceptions to and exemptions from the provisions of this title shall be construed narrowly in order to maximize deterrence of discriminatory conduct."). Thus, "there are no accommodations that may be unreasonable if they do not cause undue hardship" and if the person aggrieved can enjoy the right of rights in questions. *See Vangas v. Montefiore Med. Ctr.*, 6 F. Supp. 3d 400, 416 (S.D.N.Y. 2014).

## II.    Mr. Frilando Is Entitled to Reasonable Accommodations to Take the Pre-Employment Tests

The sole issue in this case should be whether Mr. Frilando is entitled to reasonable accommodations to take the pre-employment tests. When, as here, an applicant is eligible to take a pre-employment test, that should be the end of the inquiry.

**A.**    **Consistent with Judge Schofield's Decision, an Employer's Obligation to Provide Reasonable Accommodations Equally Applies to Employees and Applicants Who Can Take a Pre-Employment Test**

As Judge Schofield observed, Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures [and] . . . hiring." 42 U.S.C. § 12112(a), *cited by* Mem. & Order at 14. Yet Defendants attempt to relitigate this issue, contending that Mr. Frilando could not perform the essential functions of the jobs. The logical consequence of this argument is to permit a safe harbor for employers to openly discriminate in job-application procedures if an employer could arguably show that an applicant was not qualified for the underlying job. That is not the law.

It is true, as Defendants have argued, that the "employment position that Plaintiff desired was Train Operator, Bus Operator, or Track Worker—not test-taker." Defs. Br. in Opp'n to Pl. Mot. in Limine at 8, ECF No. 88. Although the interactive process is often described "in terms of accommodations that enable the individual with a disability to perform the essential functions of the position held or desired, it is equally applicable to accommodations involving the job application process." 29 C.F.R. Part 1630 App. Consider the following interpretive guidance from the EEOC, which foreshadowed the arguments in this case:

> Does an employer have to provide a reasonable accommodation to an applicant with a disability even if it believes that it will be unable to provide this individual with a reasonable accommodation on the job?
>
> Yes. . . . [I]ndividuals with disabilities who meet initial requirements to be considered for a job should not be excluded from the application process because the employer speculates, based on a request for reasonable accommodation for the application process, that it will be unable to provide the individual with reasonable accommodation to perform the job. . . . Thus, an employer should assess the need for accommodations for the application process separately from those that may be needed to perform the job.

*See* EEOC Guidance – Question 13, https://www.eeoc.gov/policy/docs/accommodation.html. That is especially true here. After an applicant has taken the test, he or she is placed on an eligibility list and may take an oral-proficiency assessment depending on the position. Trial Tr. 254:11-24 & 256:17-19 (Quiery Cross). Then the applicant could be invited for a medical evaluation, and if someone like Mr. Frilando were to fail the hearing test, there are still further steps involved, including "a job practical where [Defendants] test the individual's ability to do the job skills." Trial Tr. 561:25-562:15 (Bienenfeld Cross). In other words, no applicant is categorically disqualified for failing the initial hearing test. Trial Tr. 562:19-25 (Bienenfeld Cross).

This conclusion is consistent under the City Law: "An employer's obligation to provide reasonable accommodations is not limited to current employees, but equally applies to applicants and interviewees." Commission Guidance at 89, https://on.nyc.gov/2zu4LKj. That is to say, a reasonable accommodation is available to "an individual with a disability to apply for a job, interview for a job, perform a job, or have equal access to the workplace and employee benefits." *Id.* at 88. Contrary to Defendants' position, this mandate applies to each step of the employment process: (1) "job postings and advertisements," (2) "applications," (3) "interviews," (4) "selection processes after interviews," and (5) "procedures related to current employees." *Id.* at 36-43 (outlining forbidden conduct under each enumerated area). For all these reasons, the Court need not evaluate whether Mr. Frilando could perform the essential functions of the jobs.

**B.** **As a Factual Matter, Virtually Everyone Can Take Defendants' Pre-Employment Tests, and Mr. Frilando Was Scheduled to Do So**

Based on the evidence at trial, virtually everyone could take the tests. *See, e.g.*, Trial Tr. 55:18-19 (Garcia Direct) & 253:9-15 (Quiery Cross). If a position does not require formal education or experience like the Track Worker position, an applicant is only required to submit (i) an application form and (ii) any requests for makeups or special accommodations. *See* Trial Tr.

64:12-65:7 (Garcia Direct). Thus, as Ms. Garcia agreed, an applicant "is scheduled for the test simply by virtue of having applied for it." Trial Tr. 73:11-13 (Garcia Cross). That happened with Mr. Frilando because he received admission letters for all three tests at issue. Pl. Ex. 19. And even if an applicant did not meet the qualifications of the position, he or she could still take the test, according to Mr. Quiery. Trial Tr. 253:9-15 (Quiery Cross). Thus, Mr. Frilando was eligible (or "qualified") to take the pre-employment tests.

### C.   For the City Law Claim, the Court Should Preclude Any Evidence of Undue Hardship, as Contemplated by 28 C.F.R. § 35.164, Beyond the Contemporaneous Emails

Back on August 31, 2018, Defendant provided its categorical position to Mr. Frilando. Pl. Ex. 11 at PLA1. In the present day, however, Defendants' rationale has morphed and multiplied. The Court should reject any post-hoc defenses that were not raised in Michael Nigro's email in August 2018, as described in Plaintiff's Motion in Lime. *See* ECF No. 82-1. In a nutshell, the City Law goes further than its federal counterparts,[4] and under Title II of the ADA, an undue-hardship defense must be memorialized in "a written statement" made by "the head of the public entity or his or her designee." 28 C.F.R. § 35.164; *Am. Council of the Blind of N.Y., Inc. v. City of N.Y.*, No. 18 Civ. 5792 (PAE), 2020 U.S. Dist. LEXIS 194231, at *55-56 (S.D.N.Y. Oct. 20, 2020) (collecting cases on this requirement). Along with the City Law's liberal construction, the Commission's guidance clearly contemplates a written component like 28 C.F.R. § 35.164. *See, e.g.*, Commission Guidance at 66, https://on.nyc.gov/2zu4LKj ("[E]mployers must notify the individual in writing that the cooperative dialogue has concluded."). Thus, Defendants' undue-

---

[4] Under the 2005 Restoration Act, the City Law commands that it must "be construed liberally . . . regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed." N.Y.C. Admin. Code § 8-130(a). Indeed, the City Law "requires an independent analysis." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108-09 (2d Cir. 2013).

hardship arguments should be limited to the content of Michael Nigro's email on August 31, 2018.

### D. Defendants Failed to Show Undue Hardship

Although Defendants "ha[ve] the burden of proving undue hardship," N.Y.C. Admin. Code § 8-102, Plaintiff will show how their justifications—new and old—lack merit.

***Fundamental Alteration of the Test.*** The centerpiece of Defendants' position is that any interpretation of the written test would fundamentally alter the jobs, which purportedly "require the ability to understand and be understood in English." Trial Tr. 27:6-15 (Defs. Opening). But according to Fed. R. Civ. P. 30(b)(6) testimony from Mr. Quiery, the purpose of the tests is not to test English literacy. *See, e.g.*, Trial Tr. 162:6-163:20. Nor does the Track Worker test, for example, measure English reading levels. Trial Tr. 184:9-11 & 185:8-19. That conclusion aligns with the written description of the test, which provides a bare-bones statement on the "Written Comprehension" section: "The ability to understand written sentences or paragraphs. Example: Reading and understanding a safety bulletin." Pl. Ex. 20 at DEF13.

But most importantly, Defendants' argument is contradicted by the actual Track Worker test. At first blush, it is "a difficult and comprehensive test," ██████████████████████ ████████████████████████ Trial Tr. 461:18-23 & 572:14-20. Thus, ASL interpretation would not fundamentally alter the test because written comprehension of English is not the purpose of the test. Plus, it is clear that Mr. Frilando possesses a rudimentary understanding of English based on the emails in evidence and his sworn testimony and that of Dr. Judy Shepard-Kegl. Ms. Garcia even agreed that she had no difficulties in understanding Mr. Frilando's emails. Trial Tr. 58:21-25 (Garcia Direct). Thus, in light of this evidence, Mr. Frilando arguably meets the English requirement and should receive an ASL interpreter to spot the issues on the test.

***Uniform Administration of the Test.*** Relatedly, defense witnesses expressed concerns

about the uniform administration of the test under the belief that "English and American Sign Language are [not] a one-to-one translation." Trial Tr. 104:14-23 (Nigro Direct). But this argument ignores reality. For example, the Southern District of New York has "interpreters who translate to Spanish, Chinese, and a dozen other languages," and court proceedings are not fundamentally unreliable. *See* Trial Tr. 103:9-20. Furthermore, Dr. Shepard-Kegl explained that interpreters are "required to give message equivalents between one text in English and another text in ASL." Trial Tr. 328:12-16 (Shepard-Kegl Direct). "[T]he interpreter is not allowed to add information or clarify . . . ." Trial Tr. 329:25-330:3 (Shepard-Kegl Direct).

*Proper Supporting Documentation.* Next, Defendants assert that Mr. Frilando failed to submit the proper supporting documentation to justify an ASL interpreter for the written questions and answer choices. *See* Trial Tr. 23:2-24:6 (Defs. Opening). But even if Mr. Frilando's application was less than punctilious, Defendants understood his requests for accommodations. Pl. Ex. 9 at DEF47-48; Pl. Ex. 8 at DEF326. Nor did Defendants state in the August 31 email that the failure to submit proper documentation was the reason for the denial. Pl. Ex. 11 at PLA1; *see also* Commission Guidance at 63, https://on.nyc.gov/2zu4LKj ("While covered entities may require medical documentation to support a request for an accommodation, they cannot require a specific *type* or *form* of documentation. Medical documentation should be considered broadly.").

*Instructions by DCAS.* Defendants also contend that "the Transit Authority was required to follow all DCAS rules, regulations, protocols, and instructions for developing and administering the exams." Trial Tr. 17:13-15 (Defs. Opening). But Defendants cannot avoid liability by delegating their legal obligations. Indeed, Defendants "may not, directly or indirectly or through contractual, licensing, or other arrangements, on the basis of disability deny a qualified individual with a disability the opportunity to participate in or benefit from [an] aid, benefit, or service." *See,*

*e.g.*, 28 C.F.R. § 35.130(b)(1)(i). Additionally, each MOU is not etched in stone: They can be modified by either party, and each party recognizes the obvious point that all applicable laws still apply. Pl. Ex. 13 at DEF234 & DEF236. Finally, the Bus Operator position under MaBSTOA "is not governed by DCAS." Trial Tr. 269:24-270:1 (Quiery Redirect).

**Hearing Requirements.** Defendants further contend that "[a]n essential function of all three jobs is hearing at a sufficient level to hear sounds, horns, radio dispatches, vibrations," and so on. Trial Tr. 24:15-19 (Defs. Opening). But no applicant is categorically disqualified for failing the initial hearing test because someone like Mr. Frilando could take "a job practical where [Defendants] test [his] ability to do the job skills." Trial Tr. 562:19-25 & 561:25-562:15 (Bienenfeld Cross).

### E.     For Pre-Employment Accommodations, Defendants' Failure to Engage in the Interactive Process in Good Faith Is an Independent Legal Violation

Under State and City Law, "an employer's failure to engage in the interactive process is itself a violation of the law." *Vangas*, 6 F. Supp. 3d at 420. The interactive process "requires the employer to investigate an employee's request for accommodation and determine its feasibility." *Id.* (quotation marks omitted). Good faith is the governing standard. *See id.* On the surface, yes, Defendants communicated with Mr. Frilando for sixteen months, but upon deeper inspection, Defendants' participation rings hollow. At the risk of repetition, Defendants rely on DCAS. "Depending on the nature of the accommodation being requested," DCAS "could refer to the job analysis to ensure that the accommodation being sought wouldn't change the nature of the test."[5] Trial Tr. 305:5-14 (Alexander Direct). But Mr. Alexander did not review any of the job-analysis

---

[5] Defendants conduct job-analysis reports to "identify[] the knowledge, skills, and abilities required to perform the essential functions of the position." Trial Tr. 218:9-21 (Quiery Cross) & 283:9-11 (Alexander Direct). In turn, "the tests are developed to test for those abilities, or knowledges, or skills." Trial Tr. 219:23-220:4 (Quiery Cross).

reports for the positions that Mr. Frilando applied to. Trial Tr. 305:16-20 (Alexander Direct). Ultimately, other than the English requirement, DCAS provided no rationale to Defendants for rejecting Mr. Frilando's request for an interpreter for the written questions and answer choices. Trial Tr. 187:9-18 (Quiery Direct). Thus, there was no good-faith investigation about whether Mr. Frilando could take the pre-employment tests with reasonable accommodations.

## III. Defendants Are Still Liable Even if the Court Were to Consider Whether Mr. Frilando Can Perform the Essential Functions of the Three Jobs, With or Without Reasonable Accommodations

### A. Under the City Law, Defendants Bear the Burden of Proof and Have Failed to Satisfy Their Affirmative Defense

In the opening statement, defense counsel stated that under the law, including "the New York City Human Rights Law, Mr. Frilando is required to prove that he would be able to perform the essential functions of each job." Trial Tr. 24:8-14 (Defs. Opening). That is wrong. Even if the analysis moved from the pre-employment tests to the essential functions of the job, Mr. Frilando may have the burden under state and federal law—but not under the City Law. Defendants even recognized their burden in opposing Plaintiff's Motion in Limine:

> In any case where the need for reasonable accommodation is placed in issue, it shall be an affirmative defense that the person aggrieved by the alleged discriminatory practice could not, with reasonable accommodation, satisfy the essential requisites of the job or enjoy the right or rights in question.

N.Y.C. Admin. Code § 8-107(15)(b), *cited by* Defs. Br. in Opp'n at 9, ECF No. 88.

In short, Defendants have failed to carry their burden. None of Defendants' employees testified that Mr. Frilando was not qualified for the three jobs, and Mr. Frilando is not disqualified because of the hearing requirements. Among other things, he would need to take "a job practical where [Defendants] test [his] ability to do the job skills." Trial Tr. 562:19-25 & 561:25-562:15 (Bienenfeld Cross). That did not happen, and so Defendants cannot meet their affirmative defense.

**B.    For on-the-Job Accommodations, Defendants Failed to Engage in the Interactive Process**

To reiterate, under State and City Law, Defendants' failure to engage in an interactive process would be a violation of the law. If the Court were to consider the essential functions of the job, Defendants conducted no interactive process for on-the-job accommodations. According to Dr. Shepard-Kegl, "[t]here are many, many kinds of accommodations," including "text decoding . . . that would take someone's speech to text" or "an iPad with . . . video remote interpreting." Trial Tr. 374:25-375:8 & 444:24-445:23 (Shepard-Kegl Cross). DCAS has no involvement with accommodations for the oral-proficiency test or on-the-job accommodations, Trial Tr. 298:13-299:19 & 300:11-18 (Alexander Direct), and there is no indication that Defendants conducted their own assessment of reasonable accommodations for Mr. Frilando. *See, e.g.*, *Searls v. Johns Hopkins Hosp.*, 158 F. Supp. 3d 427, 430, 437, 441 (D. Md. 2016) (granting partial motion for summary judgment on liability for a deaf nurse whose "request for a full-time ASL interpreter was reasonable" because the "request would not have reallocated the essential job functions of communicating with others and responding to alarms"). That alone is a violation.

There are about 1,791 Track Workers, who perform one of ten jobs: (1) "Subway Maintenance," (2) "Elevated Maintenance," (3) "Track Cleaning (Night Lubricators)," (4) "Subway Construction Nights," (5) "Track Construction," (6) "Fabrication and Fleet Operations," (7) Work Trains," (8) "Emergency Response," (9) Chief Officer (Track Infrastructure)," and (10) "Track Engineering." Pl. Ex. 21 at DEF130. "There are also approximately 9 employees who perform various administrative functions in various office settings, transportation operations and in the union offices." *Id.* The record contains no evidence showing that Defendants determined that Mr. Frilando could not perform the essential functions of any of the ten jobs or the various administrative roles with reasonable accommodations.

### C.     Under State and Federal Law, Mr. Frilando Has Satisfied His Burden Because Among Other Things, He Can Perform the Track Worker Position

Even if the Court finds that this issue is relevant, Mr. Frilando has established that he can perform the essential functions of the jobs at issue, especially the Track Worker position.[6] Federal regulations list non-dispositive factors to determine "whether a particular function is essential," including (1) "[t]he employer's judgment as to which functions are essential," (2) "[w]ritten job descriptions prepare before advertising or interviewing applicants for the job," (3) "[t]he amount of time spent on the job performing the function," and (4) "[t]he work experience of past incumbents in the job." 29 C.F.R. § 1630.2(n) (providing additional factors that do not apply).

As for the first, second, and third factors, the Track Worker position has "no formal education or experience requirements." Pl. Ex. 20 at DEF11. In the Notice of Examination, the "Job Description" contains no specific references to hearing-related requirements:

> Track Workers, under supervision, maintain, install, inspect, test, alter, and repair the track and roadway in subway and elevated service under operating conditions. This includes, but is not limited to, the maintenance, installation, inspection, testing, alteration and repair of rails, frogs, switches, ties, plates and insulated joints, and their related adjusting, tamping, welding, grinding, greasing and cleaning. Track Workers perform related work.
>
> Some of the physical activities performed by Track Workers and environmental conditions experienced are: working outdoors in all weather conditions; lifting and carrying tools, equipment and materials weighing up to 95 pounds; working on elevated structures up to 100 feet high; walking along the track way where tripping hazards are present; distinguishing between different colored lighted signals and flags; driving in large spikes with mauls and pulling

---

[6] Even if the Court were to consider the essential functions of the job and rule against Mr. Frilando, he would still be entitled to compensatory damages under the City Law because of Defendants' failure to accommodate him at the pre-employment stage. N.Y.C. Admin. Code § 8-502(h)(2). Likewise, he would be entitled to nominal damages under federal law. *Tolbert v. Queens Coll.*, 242 F.3d 58, 74 (2d Cir. 2001) ("[A] plaintiff who has proven a civil rights violation, but has not proven actual compensable injury, is entitled as a matter of law to an award of nominal damages.").

> spikes out with claw bars; and working in a noisy environment near
> live third rail and in the path of oncoming trains.

Pl. Ex. 20 at DEF11. The only hearing-related aspect—"working in a noisy environment"—may

actually favor Mr. Frilando. Trial Tr. 404:13-18 (Frilando Direct) (detailing Mr. Frilando's use of

hearing aids to hear "cars or noisy things") & 441:22-25 (Shephard-Kegl Cross) ("[D]eaf people

are very good at . . . working in noisy environments and being able to pick up a lot more than

hearing people are. . . . [P]eople who have spent their life with visual vigilance are actually going

to have a little bit of an edge over hearing people wearing earplugs.").

      Of course, track workers do not take a vow of silence. They are expected to communicate

as they perform the physical tasks listed above. At the same time, however, the communication

does not appear to be an essential function of the job. By contrast, the Bus Operator and Train

Operator positions reference some minimal communication-related requirements:

- **Bus Operator's Job Description:** "hearing horns, buzzers and verbal warnings" (Pl. Ex. 20 at DEF17)

- **Train Operator's Job Description:** "may make announcements" and "responding to audible signals such as alarm bells, train whistles, horns and radio conversations" (*id.* at DEF5)

The job analysis, which is described in more detail below, also provides helpful context. For the

Track Worker position, only three of nineteen duties fall under a section entitled

"Communication":

- 17. Receive/give instructions, requests, orders, and information from posted bulletins, memorandums, rules and regulation manuals, coworkers and/or supervisors

- 18. Participate in group discussions including unit meetings, job briefings, safety meetings

- 19. Fill out handwritten reports and documents such as G-2, sick forms, timesheets and accident reports, and vacation day forms

Pl. Ex. 21 at DEF135-136. For the Bus Operator position, seven of twenty-five duties fall under "Communication," *id.* at DEF149-150, and for the Train Operator position, eleven of fifty-three duties fall under "Communication," *id.* DEF171-175. Put another way, the Track Worker position—and thus the accompanying test—ostensibly involves the least amount of communication or written comprehension.

As for the fourth factor—the "current work experience of incumbents in similar jobs," MTA New York City Transit conducted job analysis on the Track Worker position. The goal was "to determine the knowledge, skills and abilities that are required to perform the essential functions of the position in order to develop an appropriate examination." Pl. Ex. 21 at DEF129. The Job Description in this job analysis matches that in the Notice of Examination. *See id.* The job analysis also contains a section describing how various incumbents perform all sorts of different duties:

- "As a Specialist Operator, his main responsibility is to build and repair train track based on fix specifications."

- As a worker in the Linden Shop, "[h]is main responsibility is to build panels including drilling, clipping, laying straps, rails and plates, and gluing plastic pads."

- "As a Chauffeur, his main responsibility is to drive MTA NYC Transit trucks to job sites."

*Id.* at DEF131. Thus, Mr. Frilando can perform the essential functions of the jobs with reasonable accommodations, especially when there are a variety of positions that he could occupy.

## DAMAGES ANALYSIS

### I.     Money Damages

Mr. Frilando seeks noneconomic compensatory damages under all claims. 42 U.S.C. § 12117(a) (ADA); 29 U.S.C. § 794a (Rehabilitation Act); N.Y. Exec. Law § 297(9) (State Law); N.Y.C. Admin. Code. §§ 8-502(a) & 8-502(h)(2) (City Law). Because of Defendants'

discrimination, Mr. Frilando is seeking damages for emotional distress under city, state, and federal law. He is also seeking damages for statutory violations of his civil rights under the City Law. N.Y.C. Admin. Code. § 8-502(h)(2)

### A.    The City Law Provides for Damages Solely for Statutory Violations

Under the City Law, Mr. Frilando is entitled to compensatory damages even if the Court were to find that his "only injury is the deprivation of a right granted or protected by [the statute]," N.Y.C. Admin. Code § 8-502(h)(2), because he is "claiming to be a person aggrieved by an unlawful discriminatory practice as defined [by the statute]," *id.* § 8-502(a).

### B.    Under State and City Law, Mr. Frilando Is Entitled to Damages for Emotional Distress Without Proof of Intentional Discrimination Because Defendants' Conduct Caused Him to Suffer Frustration, Humiliation, and Other Emotional Anguish for Sixteen Months Before the Lawsuit Was Even Filed

Mr. Frilando's damages should be amplified because of the emotional distress he suffered, and he is not required to show intentional discrimination. *Vega-Ruiz v. Montefiore Med. Ctr.*, No. 17-CV-1804-LTS-SDA, 2019 U.S. Dist. LEXIS 117406, at *15 (S.D.N.Y. July 15, 2019); *Brooklyn Ctr. for Psychotherapy, Inc. v. Phila. Indem. Ins. Co.*, 955 F.3d 305, 312 (2d Cir. 2020) ("[F]ailure-to-accommodate claims do not require proof of discriminatory intent."). In evaluating emotional distress, the Second Circuit has "grouped" claims "into three categories of claims: garden-variety, significant, and egregious." *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 319 (S.D.N.Y. 2018) (citation omitted). The categories vary in duration, severity, and consequences, but even for the garden-variety category, the Second Circuit has affirmed six-figure awards "where the evidence of emotional distress consisted only of testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress." *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) (recounting how the Second Circuit has "affirmed awards of $125,000" for age-discrimination cases and "rejected the defendant's contention that those damage

awards, for garden variety emotional distress claims, should have been reduced to between $5,000 and $30,000" (citations omitted)), *cited by Duarte*, 341 F. Supp. 3d at 320. The same is true in all areas of discrimination. *See Broome v. Biondi*, 17 F. Supp. 2d 211, 223-26 (S.D.N.Y. 1997) (explaining that a "jury's compensatory award of $ 114,000 . . . for emotional damages" for each of the two plaintiffs was "not excessive" in a race-discrimination case because the "genuine emotional pain associated with such discrimination should not be devalued by unreasonably low compensatory damage awards").

But the Second Circuit's categories are somewhat meaningless without the accompanying facts, and so courts often compare a damages "award to awards allowed in analogous cases involving similar types of injuries." *Duarte*, 341 F. Supp. 3d at 319-20 (citation omitted). There is only a small universe of jury verdicts with deaf plaintiffs, but the following cases, one of which arises in the Second Circuit, provide a brief illustration on failure-to-accommodate cases:

- $250,000 jury award for compensatory damages when a hospital declined to provide ASL interpreters despite repeated requests over three months, *Lamonica v. North Shore Univ. Hosp.*, No. 94 Civ 5993, 1997 Jury Verdicts LEXIS 69840, at 1-2 (E.D.N.Y. Aug. 20, 1997);

- $230,000 jury award for compensatory damages when police officers failed to provide accommodations for a motorist, who was severely hearing-impaired, during sobriety tests and then an arrest, Miranda warnings, and an interrogation, *Delano-Pyle v. Victoria Cnty.*, 302 F.2d 567, 570-72, 576 (5th Cir. 2002) (upholding the award); and

- $200,000 jury award for compensatory damages and $200,000 in punitive damages when a rheumatologist refused to provide an ASL interpreter despite repeated requests over 20 months*, Gerena v. Fogari*, No. HUD-L-5805-05, 2008 Jury Verdicts LEXIS 33319, at 1-2 (N.J. Super. Ct. Oct. 9, 2008).

The common thread running through these cases is that adequate compensation is especially warranted if the discrimination affects a person's liberty or occurs over a lengthy period of time.

Indeed, as described in Section I.D. of the "Background" section, Mr. Frilando is entitled to adequate compensation for his emotional distress where he faced discrimination over the course of sixteen months. Civil-rights violations are inherently distressing because they inflict a "profound personal humiliation." *Powers v. Ohio*, 499 U.S. 400, 413 (1991). When a person like Mr. Frilando is excluded from an aspect of public life, that discrimination "denigrates the dignity of the excluded" and "reinvokes a history of exclusion," *J.E.B. v. Alabama*, 511 U.S. 127, 142 (1994), and "[a]s a matter of both common sense and case law, emotional distress is a predictable, and thus foreseeable, consequence of [such] discrimination," *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1199 (11th Cir. 2007).

### C. Under the Rehabilitation Act, Mr. Frilando Is Entitled to Damages for Emotional Distress Because Defendants Discriminated Against Him Through Deliberate Design and Apathetic Attitudes

Mr. Frilando is entitled to full relief under all claims, including the Rehabilitation Act. To recover damages under that statute, a plaintiff must prove intentional discrimination through deliberate design or "'apathetic attitudes.'" *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 267, 279 (D.D.C. 2015) (quoting *Alexander v. Choate*, 469 U.S. 287, 296 (1985)). Indeed, a covered entity's "indifference to [a plaintiff's] rights may . . . be[] so pervasive as to amount to a choice." *See, e.g.*, *Puerner v. Hudson Spine & Pain Med., P.C.*, No. 17-cv-03590 (ALC), 2018 U.S. Dist. LEXIS 147276, at *11-12 (S.D.N.Y. Aug. 28, 2018) (quotation marks omitted). Here, even if Defendants "had the best of intentions" and "believed themselves to be within the confines of the law," "they nevertheless intentionally violated [Mr. Frilando's rights]" when they withheld "the reasonable accommodations to which []he was entitled under the law." *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 970 F. Supp. 1094, 1151 (S.D.N.Y. 1997), *aff'd in part and vacated in part on other grounds*, 156 F.3d 321 (2d Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999).

## II.   Injunctive and Declaratory Relief

As for injunctive and declaratory relief, the Court should order that Defendants provide Mr. Frilando with the following accommodations for the pre-employment tests: (1) 200% extra time, as already agreed; (2) an ASL interpreter for any instructions, as already agreed; and (3) an ASL interpreter for the written questions and answer choices. The Court should also order Defendants to revise their policies and procedures to permit interpretation of written pre-employment tests with ASL interpreters.

## III.   Attorney's Fees

If the Court concludes that Defendants are liable, Plaintiff is entitled to seek attorney's fees. N.Y.C. Admin. Code § 8-502(g) (explaining that under the City Law, "the court, in its discretion, may award the prevailing party reasonable attorney's fees, expert fees and other costs."); *see also* 42 U.S.C. §§ 12117(a) & 12205 (ADA); 29 U.S.C. § 794(a) (Rehabilitation Act); N.Y. Exec. Law § 297(9) (State Law).

## CONCLUSION

The Court should find Defendants liable and award Plaintiff with compensatory damages, injunctive and declaratory relief, and attorney's fees.

Dated: November 4, 2020                    Respectfully submitted,

/s/ *David John Hommel*
Andrew Rozynski, Esq.
David John Hommel, Esq.
**EISENBERG & BAUM, LLP**
24 Union Square East, Fourth Floor
New York, NY 10003
Main: (212) 353-8700
Fax: (212) 353-1708
arozynski@eandblaw.com
dhommel@eandblaw.com
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

On November 4, 2020, I electronically filed this document with the Clerk's Office using the CM/ECF system, which then sent a Notice of Electronic Filing to all registered attorneys.

Dated: November 4, 2020

Respectfully submitted,

/s/ *David John Hommel*
Andrew Rozynski, Esq.
David John Hommel, Esq.
**EISENBERG & BAUM, LLP**
24 Union Square East, Fourth Floor
New York, NY 10003
Main: (212) 353-8700
Fax: (212) 353-1708
arozynski@eandblaw.com
dhommel@eandblaw.com
*Attorneys for Plaintiff*