```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| KENNETH FRILANDO,<br><br>          Plaintiff,<br><br>     -against-<br><br>NEW YORK CITY TRANSIT<br>AUTHORITY, *et al.*,<br><br>          Defendants. | 18-cv-5204 (JSR)<br><br><u>FINDINGS OF FACT AND</u><br><u>CONCLUSIONS OF LAW</u> |

JED S. RAKOFF, U.S.D.J.

Kenneth Frilando is a profoundly deaf man whose primary language is American Sign Language ("ASL"). Between 2016 and 2018, Mr. Frilando applied for three civil service positions: bus operator with the Manhattan and Bronx Surface Transit Operating Authority ("MaBSTOA"), train operator with the New York City Transit Authority (the "NYCTA"), and track worker with the NYCTA. Each position required applicants to pass a multiple-choice exam and "to understand and be understood in English." The Department of Citywide Administrative Services ("DCAS") regulates the examination procedures for the train operator, bus operator, and track worker exams and -- as a matter of DCAS policy -- the exams are not offered in languages other than English. For each exam, Mr. Frilando sought additional time and ASL interpretation of the oral instructions, exam questions, and exam answer choices. The NYCTA and MaBSTOA offered Mr. Frilando extra time and ASL

1

interpretation of oral exam instructions, but denied Mr. Frilando's request for ASL interpretation of exam questions and answers. Mr. Frilando did not ultimately take the exams for any of the three positions.

Kenneth Frilando then sued the NYCTA and MaBSTOA (collectively, "Defendants"), alleging violations of: (1) the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*, (2) Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, (3) the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq.*, and (4) the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107.[1] On April 22, 2020, the Honorable Lorna Schofield, to whom this case was initially assigned, granted summary judgment in favor of Defendants with respect to Mr. Frilando's unpleaded disparate impact claim and his claim that the English language requirement was a discriminatory qualification standard. *See* Op. & Order on Summary Judgment, ECF No. 66, at 23. This left for trial Mr. Frilando's failure-to-accommodate claims under federal, state, and municipal law. *See id.*

---

[1] The plaintiff initially sued the Metropolitan Transit Authority (the "MTA"). *See* Compl., ECF No. 1. He amended his complaint on July 22, 2018 to add the NYCTA and MaBSTOA as defendants and then, a month later, filed a Second Amended Complaint dropping the MTA as a defendant. *See* First Am. Compl., ECF No. 8; Second Am. Compl., ECF No. 19.

2

Thereafter, the case was reassigned to the undersigned. In light of the pandemic, the parties waived their right to a jury trial and agreed to a bench trial conducted over video connection. The trial commenced on October 19, 2020 and lasted for four days. At trial, the Court received 64 exhibits and heard testimony from seven witnesses: Jennifer Garcia, an associate staff analyst for the NYCTA examinations unit; Michael Nigro, an NYCTA administrative staff analyst; Michael Quiery, Senior Director of Personnel Testing, Selection, and Classification at the NYCTA; Robert William Alexander, Acting Assistant Commissioner for the Bureau of Examinations at DCAS; Dr. Judy Shepard-Kegl, a neurolinguistics specialist; plaintiff Kenneth Frilando; and Dr. Laura Bienenfeld, Assistant Medical Director at the MTA. On October 30, 2020, the parties submitted post-trial memoranda in lieu of oral summations.

The Court has carefully reviewed the parties' pretrial submissions, the transcript of the trial, the trial exhibits, and the parties' post-trial submissions. In addition, the Court has made credibility determinations based, among other things, on its observation of each witness's demeanor and the consistency and logic of the witness's accounts. Based on all this, the Court now issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) and, for the reasons that follow, grants judgment in favor of Defendants.

Findings of Fact

Kenneth Frilando is profoundly deaf. Joint Pretrial Consent Order ("JPCO"), ECF No. 87, at ¶¶ 1-2. With hearing aids, Mr. Frilando can detect environmental noises like car horns, but he cannot understand spoken English and "has extremely poor speech and lip reading skills." Trial Tr. 404:14-18, 325:13-14. Specifically, Mr. Frilando reads English at only a third-grade reading level. Trial Tr. 325:15-20. Even with the aid of a dictionary or computerized "auto-correct," he can write only hesitantly in English. Trial Tr. 501:14-17, 502:23-503:2. In contrast, "he is completely fluent in American Sign Language." Trial Tr. 325:12-13.

To his credit, Mr. Frilando has periodically sought employment, but has had difficulty achieving that goal. Around 2017, Mr. Frilando found the track worker, train operator, and bus operator positions on the career section of the MTA website and reviewed the job description and requirements for each position. Trial Tr. 410:5-8, 482:7-16, 488:12-21, 489:3-11.

Track workers maintain, install, inspect, and repair subway and elevated train tracks, a job that requires lifting heavy equipment and working in the path of oncoming trains. *See* Def.'s Ex. 25, at 1. Because they work under hazardous conditions, track workers work in "gangs" that verbally communicate with one another about the safety aspects of the work being performed.

4

Trial Tr. 181:6-14. One core function of a track worker is "flagging," in which track workers verbally communicate with train operators about when it is safe to proceed. Trial Tr. 181:24-182:6.

Train operator responsibilities include operating subway cars and trains, preparing trains for road service, making announcements, and "responding to audible signals such as alarm bells, train whistles, horns and radio conversation." Def.'s Ex. 23, at 1.

Bus operators drive passenger buses in compliance with state law and local traffic regulations, collect fares, write reports on "revenues, accidents, faulty equipment and unusual occurrences," and must be able to "hear[] horns, buzzers and verbal warnings." Def.'s Ex. 24, at 1.

After reading the requirements for each application, Mr. Frilando applied for each position. Trial Tr. 410:14-15. He believed he was suited for the MaBSTOA bus operator position and NYCTA track worker position because these positions did not require formal education. *Id*. However, the train operator position at the NYCTA required a year of "work experience . . . continuous with one employer," which Mr. Frilando did not have. *See* Trial Tr. 410:16-18, 415:21-22; Def.'s Ex. 23, at 2; Def.'s Ex. 38. Although not referenced in the Notices of Examination, the track worker and train operator positions with the NYCTA and the bus operator

5

position with MaBSTOA also require candidates to meet a minimum hearing standard, which Mr. Frilando did and does not meet. *See* Trial Tr. 564:14-18, 559:12-24. Each position also required applicants "to understand and be understood in English," *see* Def.'s Ex. 23, at 2; Def.'s Ex. 24, at 2; Def.'s Ex. 25, at 2. As noted, Mr. Frilando does not speak English clearly or fluently. Finally, each position requires applicants to take and pass a multiple-choice exam. JCPO ¶ 8.

Pursuant to Memoranda of Understanding between the NYCTA and DCAS entered into in 2011 and 2018, the NYCTA must adhere to DCAS protocols in the administration and development of civil service exams. Trial Tr. 210:7-20, 212:9-14, 213:7-9. Although MaBSTOA is a separate legal entity from the NYCTA, Trial Tr. 214:14-16, nevertheless, pursuant to a 2006 Memorandum of Understanding, the NYCTA also develops and administers examinations for MaBSTOA positions, adhering to the aforementioned DCAS regulations. JCPO ¶ 21. Among other things, DCAS regulations specify that all "[c]andidates must be able to understand and be understood in English." Pl.'s Ex. 15, at E.9.1. Per DCAS policy, examinations must be administered in English and the questions may not be translated into any other language. *See* Trial Tr. 53:4-7, 297:7-13.

An examination development group (the "Exams Unit") develops qualifying exams for both NYCTA and MaBSTOA positions after

6

producing a detailed "job analysis," which must be updated at least every five years. *See* Trial Tr. 206:1–4, 218:12–16. Through field interviews, surveys, and on-the-job observation of employees and their supervisors, the job analysis identifies the "knowledge, skills, and abilities required to perform . . . essential tasks on the job." Trial Tr. 218:21–219:7. The Exams Unit also asks "incumbents in the position . . . [to] give importance and frequency ratings" to these core tasks. Trial Tr. 219:12–17. Based on incumbents' ratings, the Exams Unit determines what knowledge, skill, or abilities the qualifying exams should test. Trial Tr. 219:17–20.

For the train operator position, the Exams Unit determined based on the job analysis that "written comprehension" and "written expression" were sufficiently important and frequently used skills to "be included in the competitive multiple-choice test plan." *See* Def.'s Ex. 26, at 22. Accordingly, 10 of the 60 questions on the train operator exam test "written comprehension" and 9 test "written expression." *Id.* at 25. Similarly, the job analysis for the track worker exam indicates that "written comprehension" and "written expression" abilities should be tested on the qualifying exam. *See* Def.'s Ex. 28, at 10.

The bus operator exam was primarily developed for MaBSTOA by an outside company. Trial Tr. 142:15–18. However, the bus operator exam was also developed using a job analysis report. *See* Def.'s

7

Ex. 27; *see also* Trial Tr. 142:22-24. The job analysis for the bus operator exam indicates that it is "important" for a bus operator to be able to "[r]ead and interpret bulletins and directives," "[r]eport unusual circumstances," and "[r]eport delays, mechanical problems and emergencies to the Dispatcher via two-way radio." Def.'s Ex. 27, at 12. Accordingly, the multiple-choice bus operator exam includes questions testing "written comprehension" and "written expression." *Id.* at 13.

On April 20, 2017, Mr. Frilando emailed the Exams Unit to request an ASL interpreter for the instructions and test questions on the train operator exam. *See* Def.'s Ex. 5. Mr. Frilando submitted an audiological report and a doctor's note with his accommodation request. *See* Trial Tr. 410:25-411:3; Def.'s Ex. 5, 6. Although Mr. Frilando did not initially request additional time in taking the exam, the doctor's note stated that "as the result of his disability, Mr. Frilando will need some additional time to complete his DCAS testing." Def.'s Ex. 4.

A month later, Jennifer Garcia, an associate analyst at the NYCTA, informed Mr. Frilando that the NYCTA would provide extra time for taking the exam and an ASL interpreter to interpret the test instructions in ASL but not to interpret the exam questions themselves, adding that "[y]ou need to be able to read in English if you want to take the exam." Pl.'s Ex. 1, at 1.

While waiting for Mr. Frilando to confirm whether he wanted to take the train operator exam, Ms. Garcia sent the accommodation request and supporting documentation to her manager, Michael Quiery. *See* Pl.'s Ex. 2; *see also* Trial Tr. 40:23-41:8. Mr. Quiery believed that more documentation was needed to support Mr. Frilando's request for an interpreter. *See* Def.'s Ex. 8. Accordingly, on June 2, 2017, the Exams Unit informed Mr. Frilando that "[u]pon further review of the document submitted to support your request, we can only grant your request for additional time" and sought additional documentation from a licensed medical professional specifically supporting Mr. Frilando's request for an ASL interpreter. Pl.'s Ex. 3.

On November 21, 2017, Mr. Frilando requested ASL interpretation of the instructions and questions on the bus operator exam. Def.'s Ex. 12. On March 1, 2018, Mr. Frilando requested ASL interpretation of the instructions and questions on the track worker exam. Def.'s Ex. 13. A week later, Michael Nigro confirmed that the NYCTA was "in the process of planning your accommodation(s)" for the track worker, train operator, and bus operator exams and inquired whether Mr. Frilando sought additional time as well as ASL interpretation. *Id.* In response, Mr. Frilando confirmed that he was requesting additional time. *Id.* Michael Nigro inquired about Mr. Frilando's calendar availability to take the exams, but Mr. Frilando did not respond until several weeks later.

9

*Id.* On April 2, 2018, Mr. Frilando confirmed his availability and asked for 100% extra time. *Id.*

In late August 2018, the Exams Unit ultimately offered Mr. Frilando 200% of the time otherwise prescribed for taking each exam, as well as ASL interpretation of the spoken and printed exam instructions. Trial Tr. 97:5-8; *see also* Pl.'s Ex. 11 ("In response to your request for a reasonable accommodation we have agreed to provide an ASL interpreter to translate our staff member's oral instructions, and any communications between you and our staff member, and provide you with additional time to complete the exams."). However, the Exams Unit maintained that it would "not provide translation or interpretation services of test examination questions for any candidate whose primary language is not English,"[2] because "the positions require that the candidate understand and be understood in English." Pl.'s Ex. 11. The NYCTA offered Mr. Frilando several late August and early September 2018 test dates for the track worker, train operator, and bus operator exams, but Mr. Frilando did not take any of the three exams. *See* Pl.'s Ex. 11; JCPO ¶ 23.

## Conclusions of Law

Against this factual background, Mr. Frilando argues that Defendants discriminated against him on the basis of disability in

---

[2] As previously noted, Mr. Frilando's primary language is American Sign Language.

violation of the ADA, the NYSHRL, the NYCHRL, and the Rehabilitation Act by failing to accommodate his request for ASL interpretation of the questions and answers on the track worker, train operator, and bus operator exams. For the reasons that follow, the Court concludes that Defendants are not liable for disability discrimination under any of these laws.

To succeed on a reasonable accommodation claim under the ADA, a plaintiff must be "otherwise qualified" for the position, meaning that he "can perform the essential functions of the employment position" at issue "with or without reasonable accommodation." *See* 42 U.S.C. §§ 12111(8), 12112(a). Failure to accommodate claims under the ADA, NYSHRL, NYCHRL, and Rehabilitation Act all have this element in common. *See McMillan v. City of New York*, 711 F.3d 120, 125-26 (2d Cir. 2013) (ADA claim); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 n.1 (2d Cir. 2000) (noting that the NYSHRL requirement that a prospective employee be able to perform job activities in a reasonable manner to prevail on a reasonable accommodation claim "parallels [the analysis] used in the ADA context"); *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 103-04 (2d Cir. 20003) (holding that NYCHRL's requirement that plaintiff "satisfy the essential requisites of the job" is "also parallel" to the ADA's "otherwise qualified" requirement); *Loeffler v. Staten Island Univ.*, 582 F.3d 268, 275 (2d Cir. 2009) (noting that "a 'handicapped person' as defined in the

11

[Rehabilitation Act]" must be "'otherwise qualified' to participate in the offered activity or to enjoy its benefits"). Because the reasonable accommodation provisions of the statutes under which Mr. Frilando sues are "generally equivalent," the Court analyses them together. *See, e.g.*, *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 187 (2d Cir. 2015) (analyzing the standards of the ADA and the Rehabilitation Act together).

When a job applicant claims he or she was denied a reasonable accommodation to take a preemployment exam, courts ask (1) whether the applicant is qualified to perform the essential functions of job with (or without) an accommodation and (2) whether the preemployment exam measures the skills it intends to measure. *See, e.g.*, *Bartlett v. New York State Bd. of Law Examiners*, 970 F. Supp. 1094, 1128-31 (S.D.N.Y. 1997) (Sotomayor, J.) (finding plaintiff was denied reasonable accommodations to take the bar exam, because plaintiff demonstrated she was otherwise qualified to be a lawyer by successfully "self-accommodat[ing]" as a law clerk pending admission and because the bar exam "is not intended and does not measure the ability of applicants to answer questions within time constraints"), *rev'd in part on other grounds*, 226 F.3d 69, 78 (2d Cir. 2000).

This two-step inquiry follows from the text and structure of the ADA. Title I of the ADA prohibits employers from denying a

12

reasonable accommodation to "an otherwise qualified individual with a disability who is an applicant," unless "the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). Separately, the ADA specifically addresses the use of preemployment tests in the application process by defining "discriminat[ion] against a qualified individual" to include "failing to select and administer tests concerning employment . . . to ensure that, when such test is administered to a job applicant or employee who has [an impairment,] such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impair[ed skills] . . . (except where such skills are the factors that the test purports to measure)." 42 U.S.C. § 12112(b)(7). However, unlike the general reasonable accommodation provision, the preemployment test provision does not repeat the term "qualified individual," and thus does not expressly incorporate the requirement that a candidate be able to perform the essential functions of the job.

As a result, Mr. Frilando can succeed on his disability discrimination claim if he can prove either of two things: either that he can perform the essential functions of the track worker, train operator, or bus operator jobs with (or without) an accommodation; or, alternatively, that Defendants' preemployment

13

exams do not purport to measure English comprehension and expression. The Court considers each in turn.

### I. The Essential Functions of the Positions

Mr. Frilando has not proven that he could perform the essential functions of the track worker, train operator, or bus operator jobs. When determining the "essential functions" of a position, courts look to (1) "[t]he employer's judgment as to which functions are essential," (2) "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job," (3) "[t]he amount of time spent on the job performing the function," and (4) "[t]he work experience of past incumbents in the job." 29 C.F.R. § 1630.2(n)(3). The essential functions of a position "are a matter of judgment and opinion," and "the NYCTA has a statutory responsibility to operate the transit system 'for the safety of the public.'" *Shannon*, 332 F.3d at 103 (quoting *New York City Transit Auth. v. Transp. Workers Union, Local 100*, 663 N.Y.S.2d 114, 114 (2d Dep't 1997)). The NYCTA "may properly deem" a function essential for operating public transport because the function "conduces to the safety of passengers and because it serves to limit NYCTA's tort liability in situations where [an impairment] might cause an accident as well as where it may be alleged to have done so." *Id.* (finding that the NYCTA can properly deem color vision an essential function of a bus operator position).

14

The NYCTA and MaBSTOA consider both the ability to engage in oral and written communication in English and sufficient hearing ability to meet the minimum hearing standard to be essential to the jobs here in issue. *See* Def.'s Ex. 23-25, 32; Trial Tr. 543:11-17. Because the job analyses are based on interviews with incumbents and survey data on the importance and frequency of certain tasks in each position, the job analyses are also instructive on the "essential functions" of each position. In addition, the Notices of Examination are "written job descriptions prepared before advertising or interviewing applicants for the job," and should also be given significant weight when analyzing the essential functions of the track worker, train operator, and bus operator jobs. *See* 29 C.F.R. § 1630.2(n).

The job analyses and Notices of Examination indicate that the essential functions of the track worker position include spoken communication with train operators and track workers about track hazards. The essential functions of the train operator position include making announcements in English and responding to bells, whistles, horns, and radio conversation. The essential functions of the bus operator position include writing reports on accidents and defective equipment, hearing horns and buzzers, and understanding verbal warnings in English. These functions are conducive to the safety of passengers, and thus the NYCTA and MaBSTOA have reasonably deemed them essential. *See Shannon*, 332

15

F.3d at 103. Mr. Frilando is not qualified for any of the positions for which he applied, both because, as he concedes, he cannot understand or be understood in spoken English, *see* JPCO at ¶ 5, and because trial testimony shows that Mr. Frilando cannot satisfy the minimum hearing standard for any position. *See* Trial Tr. 551:16-20, 559:12-24.

## II.  Defendants' Use of Preemployment Exams

Mr. Frilando also has not proven that Defendants' preemployment exams do not intend to measure English comprehension. While the civil service exams may not have been designed to identify a particular grade level of reading proficiency, the exams are designed to test the written comprehension and expression necessary to perform transit job functions. *See, e.g.*, Def.'s Ex. 23, at 4 (noting that the train operator exam may test written comprehension necessary to "[u]nderstand[] written bulletins released by MTA New York City Transit"); Def.'s Ex. 25, at 3 (noting that the track worker exam may test the written expression necessary to "[w]rit[e] an incident report"). The Exams Unit determined that the track worker, train operator, and bus operator exams should test "written comprehension" and "written expression." The Notices of Examination for the train operator and track worker exams confirm that the multiple-choice exams may test "[t]he ability to understand written sentences or paragraphs" or "to use English for

words or sentences in writing so others will understand." Def.'s Ex. 23, at 4; Def.'s Ex. 25, at 3.

The Court's review of the evidence related to the exams -- including a review of one of the current examinations[3] -- convinces the Court that the tests not only purport to measure English comprehension and expression, but also do in fact function as English comprehension and expression tests. For instance, certain exam questions test only whether applicants can read signs to write accurate reports. *See* Court Ex. 1, at 7–8 (requiring applicants to choose text that is the same as certain line letter designations, where some answer choices contain misspellings or inverted numbers). Because the exams plainly purport to and do measure comprehension of written English and Mr. Frilando's proposed accommodation would eliminate that very skill, Mr. Frilando cannot prove that Defendants discriminated against him in test selection or administration within the meaning of 42 U.S.C. § 12112(a).

### Good-Faith Interactive Process

Separate from the above, Mr. Frilando claims that Defendants can be held independently liable for failure to engage in an interactive process to assess his needs. Although federal, city, and state laws envision that employers will "engage in a good faith

---

[3] Because the same test questions are used repeatedly over the years, the Court examined but then placed under seal the current exam provided by the Defendants and shown to plaintiff's counsel.

interactive process that assesses the needs of the disabled individual and the reasonableness of the accommodation requested," *Vangas v. Montefiore*, 6 F. Supp. 3d 400, 420 (S.D.N.Y. 2014) (quoting *Phillips v. City of New York*, 884 N.Y.S.2d 369, 373 (2009)), the precedents are clear that failure to engage in a good-faith interactive process is evidence tending to show disability discrimination, not an independent cause of action. *Sheng v. M&TBank Corp.*, 848 F.3d 78, 86 (2d Cir. 2017); *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 97–98 (2d Cir. 2015); *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 101 (2d Cir. 2009). Similarly, a plaintiff cannot prevail under the NYSHRL or NYCHRL "solely based on the employer's failure to engage in an interactive process." *Jacobsen v. New York City Health & Hosps. Corp.*, 11 N.E.3d 159, 169–70 (N.Y. 2014); *see also LeBlanc v. United Parcel Serv.*, 2014 WL 1407706, at *18 n. 14 (S.D.N.Y. Apr. 11, 2014) (Failla, J.) (observing that "an employer's failure to engage in an interactive process is not a *per se* violation of the NYCHRL").

Separately, the Court also finds that Defendants did in fact engage in a good faith interactive process with Mr. Frilando, at least to the extent reasonably required at the early stage before Mr. Frilando chose not to take the exams. An adequate interactive process can involve "meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she

18

specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the request is too burdensome." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 218-19 (2d Cir. 2001) (internal quotation marks and citations omitted). Defendants corresponded with Mr. Frilando over sixteen months, sought details and documentation about Mr. Frilando's disability and resulting limitations, repeatedly attempted to clarify Mr. Frilando's requests, considered the requests, and discussed alternative accommodations. This lengthy exchange satisfies the interactive process requirement.

## Conclusion

For the foregoing reasons, the Clerk is hereby directed to enter final judgment in favor of Defendants and to dismiss the case.

SO ORDERED.

Dated:   New York, NY                                  _____

         January 13, 2021                              JED S. RAKOFF, U.S.D.J.